Sheldon FRIEDMAN, et al., Plaintiffs,

v.

ARIZONA WORLD NURSERIES LIMITED PARTNERSHIP, et al., Defendants.

Roger L. FROST, et al., Plaintiffs,

v.

ARIZONA WORLD NURSERIES LIMITED PARTNERSHIP, et al., Defendants.

F.N. LaCORTE, et al., Plaintiffs,

v.

ARIZONA WORLD NURSERIES LIMITED PARTNERSHIP, et al., Defendants.

K.G. MILLS, et al., Plaintiffs,

v.

ARIZONA WORLD NURSERIES LIMITED PARTNERSHIP, et al., Defendants.

John Casey CLARK, Plaintiffs,

v.

ARIZONA WORLD NURSERIES LIMITED PARTNERSHIP, et al., Defendants.

Nos. 86 Civ. 9834(KC), 88 Civ. 2212(KC), 88 Civ. 6306(KC), 88 Civ. 8795(KC) and 89 Civ. 5194(KC).

United States District Court, S.D. New York.

Jan. 24, 1990.

---

524

Beigel & Sandler, Ltd., Lewis S. Sandler and Marilyn Neiman, New York City, for plaintiffs.

Morrison Cohen Singer & Weinstein, Malcolm I. Lewin and Donald Chase, New York City, for Western defendants.

Gold & Wachtel, Elliot Silverman and Anthony Pennachio, New York City, for World defendants.

Jones Day Reavis & Pogue, Barry R. Satine and Carl F. Goodman, New York City, for Partnership defendants.

Rosenman & Colin, Arthur S. Linker and Terri L. Weiss and Fulbright Jaworski & Reavis McGrath, Marc S. Dreier and Glen Banks, New York City, for Friedman & Shaftan defendants.

Stein, Zauderer, Ellenhorn, Frischer & Sharp, Sidney H. Stein, Robin Kaufman and Eric M. Schmidt, New York City, for Andersen defendants.

Chekow & Kisner, Ronald Kisner, Great Neck City, for defendant Bryce Corp.

## OPINION AND ORDER

CONBOY, District Judge:

### I. BACKGROUND

Plaintiffs, seventy in all, have brought this action against the twenty-nine named defendants, claiming that their investment in defendant Arizona World Nurseries Limited Partnership ("AWNLP") was induced by the assertedly misleading Private Placement Memorandum (the "Memorandum" or "Offering Memorandum"), appended to which were the allegedly misleading Tax Opinion Letter and Financial Projections and Compilation Reports (the "Financial Projections"), which documents were prepared by some or all of the defendants. Plaintiffs have alleged violations of the Federal Securities laws, including Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78j(b), and Rule 10b–5 promulgated thereunder, 17 C.F.R. 240.10b–5, Sections 12(2) and 17(a) of the Securities Act of 1933 ("Securities Act"), the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961 et seq., and claims of common law fraud, negligence, and breach of fiduciary responsibility, and seek injunctive as well as declaratory relief in addition to the imposition of a constructive trust.

All of the defendants have moved to dismiss the Consolidated Complaint pursuant to Rules 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure.

### A. PROCEDURAL HISTORY

The procedural history of this litigation is long and complex. The action entitled *Friedman, et al. v. Arizona World Nurseries Limited Partnership, et al.*, 86 Civ. 9834(EW) was commenced on or about December 24, 1986 on behalf of 24 plaintiffs. In lieu of responding to various motions to dismiss, plaintiffs in *Friedman* filed an amended complaint on or about May 24, 1987, adding new plaintiffs and defendants as well as its equitable claims for relief. Various defendants renewed their motions to dismiss. At oral argument before the late Honorable Edward Weinfeld, to whom this matter was assigned prior to his death, plaintiffs' application for leave to file another amended complaint was granted. A Second Amended Complaint, on behalf of fifty-five plaintiffs, was served on or about October 1, 1987, adding another defendant and furnishing additional detail regarding the plaintiffs' claims.

On or about October 8, 1987, another action was filed in this Court entitled *Schumate, et al. v. Arizona World Nurseries Limited Partnership, et al.*, 87 Civ. 7237(EW), the complaint of which, with the exception of the 15 new plaintiffs, was identical to the Second Amended Complaint in the *Friedman* action. On November 13,

1987, plaintiffs in *Schumate* amended their complaint as of right to add still more parties and to amend various allegations regarding the plaintiffs' discovery of the alleged fraud. On January 12, 1988, after Judge Weinfeld had granted a motion to consolidate, the Consolidated Complaint, upon which the defendants' pending motions are directed, was filed. As stated above, the Consolidated Complaint was filed on behalf of seventy plaintiffs and added still more details to the allegations in the original complaint.

In addition to these actions, four other actions were filed with complaints substantially similar to the Consolidated Complaint herein, with the exception of the naming of additional plaintiffs. *Frost, et al. v. Arizona World Nurseries Limited Partnership, et al.*, 88 Civ. 2212(KC), *LaCorte, et al. v. Arizona World Nurseries Limited Partnership, et al.*, 88 Civ. 6306(KC), *Mills, et al. v. Arizona World Nurseries Limited Partnership, et al.*, 88 Civ. 8795(KC), and *Clark v. Arizona World Nurseries Limited Partnership, et al.*, 89 Civ. 5194(KC). The parties in each of these actions have stipulated that our decision with respect to the *Friedman* Consolidated Complaint shall be binding upon them.

## B. THE ALLEGATIONS

The voluminous Consolidated Complaint, which we will hereafter refer to simply as the complaint, comprises 93 pages and 171 paragraphs and incorporates by reference the Memorandum and the exhibits that were attached to it, including the tax opinion letter and the financial projections. We will attempt to briefly summarize the allegations, which, for the purposes of the pending Rule 12(b)(6) motions,[1] we must accept as true and which must be con-

strued in the light most favorable to the plaintiffs. *Airlines Reporting Corp. v. Aero Voyagers, Inc.*, 721 F.Supp. 579, 581 (S.D.N.Y.1989); *see Scheur v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974); *Dacey v. New York County Lawyers' Assoc.*, 423 F.2d 188, 191 (2d Cir.1969), *cert. denied*, 398 U.S. 929, 90 S.Ct. 1819, 26 L.Ed.2d 92 (1970).

Plaintiffs are individuals who have invested various sums totalling $3,552,500 in defendant Arizona World Nurseries Limited Partnership ("AWNLP"). ¶¶ 3–4.[2] We will sometimes refer to the plaintiffs as the limited partners.

The complaint alleges that all twenty-nine defendants participated in a "scheme to defraud" and attempts to categorize the defendants into several groups. First, there are the so-called "Western defendants" which are a number of individuals and entities who were the former owners and/or managers of the nursery business. The plaintiffs allege the "Western defendants" include the following: Beardsley Holdings, Inc., Western United Nurseries, Inc., Sonora Nursery Sales, Inc., Fountainhead Nurseries Inc., Diversified Agronomics, Ltd., Phoenix Sunbelt Nurseries, Ltd., Great western Nurseries Ltd., Arizona United Nurseries, Ltd., Phoenix Sunbelt Nurseries II, Ltd., Phoenix Sunbelt Nurseries III, Ltd., White Tanks Nurseries, Ltd., Western Group Nurseries, Tyrone Kinder, Joseph Tyler, Bryce Corporation and Sonora Nursery Management, Inc. ¶ 6. The defendant Bryce Corporation has filed a motion to dismiss separate from the rest of the Western defendants. Accordingly, for the purposes of this opinion, "Western defendants" refers to all of the Western defendants except Bryce.[3] Next, there are

---

**1.** In its recent opinion in *Cosmas v. Hassett*, 886 F.2d 8, 11 (2d Cir.1989), the Second Circuit has stated that the standard for Rule 9(b) motions is similar to the standard for Rule 12(b)(6) motions, that is "that on motions to dismiss, complaints should be read generously, and all inferences drawn in favor of the pleader." *Id.*

**2.** Paragraph references herein to the Consolidated Complaint are designated by "¶ —".

**3.** There seems to be some confusion over whether Harold Schwartz, the president of the Bryce Corporation, is a defendant in this action. Some of the defendants have stated in their memoranda of law that he is a defendant, *e.g.*, Western Defendants' Memorandum of Law at 7; Friedman & Shaftan Defendants' Memorandum of Law at 7, however, he is not in the caption of the complaint. In addition, counsel for plaintiffs, in its memorandum addressed to the motion of Bryce, does not contend that Schwartz is

the "World defendants" who acquired the nursery business from the Western defendants and sold it two weeks later to the AWNLP. ¶ 5. Counsel representing these defendants have broken down the group further: the "World defendants" are defined as World Nurseries, Inc., Worldco Services Group, Inc., M & J Holding Corp., Herman Finesod and James Haber; and the "Partnership defendants" are defined as AWNLP and its general partner, Harvey Minars. All of these defendants are alleged to be the promoters of AWNLP. ¶ 6.

Finally, there are what have been referred to as the professional defendants. The first of these are the accountants, the accounting firm Arthur Andersen & Co. and one of its partners, Ivan Faggen (the "Andersen defendants"), who prepared the tax opinion letter and certain financial projections for AWNLP. ¶ 7. The other professional defendants are the law firm of Friedman & Shaftan, P.C., and some of the firm's lawyers, Wilfred T. Friedman, Michael E. Greene, and Marcia Shaftan, as the executrix of the Estate of Robert P. Shaftan (the "Friedman & Shaftan defendants"), who are alleged to have been counsel for the AWNLP and to have drafted the Memorandum, including the Federal Income Tax Factors section and the legal opinion. ¶ 8.

The complaint alleges that all of the foregoing parties entered into a "scheme" to sell an unsuccessful nursery business in Arizona to AWNLP at an inflated price. The scheme was purportedly conceived by defendants Tyler and Kindor (who allegedly controlled the Western defendants), as the nursery business which the Western defendants allegedly owned and operated, and in which various limited partnership interests had been sold, was failing, so the investors needed to be "mollif[ied]." ¶ 40. Thus, Kindor and Tyler allegedly arranged for the Andersen defendants to prepare various financial projections and a "favorable tax opinion letter" and to structure a sale to provide apparent tax write-offs that

Kindor thought necessary to induce investors to purchase interests in AWNLP. ¶¶ 7B, 19, 44. Kindor gave Harold Schwartz, the president of the defendant Bryce Corporation, a memorandum of selling points that was prepared by Kindor, purportedly on the advice of the Andersen defendants, and Schwartz agreed to try to locate a purchaser, for which service he would receive a finder's fee. ¶¶ 43, 44. Schwartz, in turn, gave the proposal to his son-in-law, defendant Haber, who was employed by defendant Finesod, the asserted "control person" of the World defendants. ¶ 45.

Sometime in November of 1984, the World defendants are alleged to have agreed "to join Tyler, Kindor and Arthur Andersen in endeavoring to sell the nursery business to AWNLP through the intermediary purchaser" World Nurseries. ¶ 46. All allegedly agreed to structure the sale of the nursery business from the Western sellers to AWNLP "at an inflated purchase price through the use of a false appraisal and the use of World Nurseries as a sham intermediary purchaser." ¶ 47. Thus, pursuant to the purported "scheme," the Western defendants, in mid-December, sold the nursery business to World Nurseries for a total purchase price of $22 million, paid in the form of a $3 million "cash note" and a $17 million non-recourse note which was payable only from nursery income. Another $2 million was paid out of net sales of the nursery's "plant materials." ¶ 70. Then, on December 31, 1984, World Nurseries "contemporaneously" sold the business to AWNLP for approximately $33 million—$6.57 million in cash and a $26.43 million partnership note that was "wrapped around" the note given by World nurseries to the Western defendants. ¶ 71. Plaintiffs apparently admit that the offering memorandum provided to each of them fully disclosed the details of this transaction, including the $11 million step-up in purchase price from World Nurseries to

a defendant. Accordingly, we conclude that the Schwartz is not a defendant in the case and was

only carelessly referred to as such.

AWNLP, as they cite to the offering memorandum itself in the complaint. ¶ 70B.

Plaintiffs purchased their limited partnership interests in AWNLP sometime in December 1984. ¶ 3A. Plaintiffs claim to have done so in reliance on certain misrepresentations in, and omissions from, the Memorandum and the exhibits appended thereto. ¶¶ 88–94. The alleged misrepresentations include (a) the overvaluation of the nursery stock and plant materials; (b) representation of a tax deduction in a year prior to eligibility; (c) unreasonably high sales projections; (d) unreasonably low expense projections; and (e) representation of reliance on an independent inspection. ¶ 88. The alleged omissions include the failure to disclose that the appraisal referred to was "arbitrary" and "unreasonable"; that the purchase price of the nursery stock was "inflated"; that the projections were based on unreasonable assumptions; that the investment in AWNLP had no real economic substance; that the sale was structured so as to leave control and benefits of ownership with the Western defendants; that the nursery business had an unprofitable history; that certain orders recorded in the books and records were fictitious; that much of the inventory was unmarketable; that the Western defendants had a poor reputation; that the business was "in jeopardy of collapse"; that the defendants knew that the projections were improper; that the defendants had falsified records and inflated receivables; that prior businesses run by the Western defendants had failed to meet their obligations to creditors and limited partners; that the defendants had previously structured similar limited partnerships which had been denied deductions by the IRS; that tax opinion letters for the prior partnerships in which the deductions had been disallowed had been prepared by the Friedman & Shaftan defendants; and that AWNLP was controlled not by the designated general partner but by Finesod who had been the promoter of other limited partnerships in which the deductions were disallowed. ¶ 93.

The plaintiffs further allege that the "Western Sellers have contended in various litigation . . . that each limited partner assumed personal liability on AWNLP's note to World Nurseries in proportion to each limited partner's share of interest in AWNLP." ¶ 74. They do not, however, forthrightly concede what some of the defendants allege and what is readily apparent from the offering documents: that each limited partner was required to guarantee a pro rata portion of the partnership's note in order to obtain the tax deductions that were the goal of their investment. *See, e.g.,* Andersen Defendants' Memorandum of Law at 7.

Plaintiffs claim to have been damaged "in the amount of their investments." *E.g.,* ¶¶ 119, 127, 131, 138, 143, 152.

## II. ANALYSIS

In their motions, all of the defendants essentially assert that plaintiffs have attempted to charge all 29 defendants with a failure to disclose that the purchase price of the nursery business was too high and, hence, that the business could not make a profit. This "excessive" price was based on a appraisal of the value of the business which the plaintiffs claim all of the defendants should have known was not a true and fair appraisal. ¶ 61. We will proceed to analyze each defendant's liability, first under Section 10(b) and Rule 10b–5, then under Section 12(2), then under Section 17(a), then under RICO, and finally under the common law.

## A. LIABILITY UNDER SECTION 10(B)

It is well settled that in order to state a claim under Section 10(b) of the Securities Exchange Act, 15 U.S.C. § 78j(b) (1982) or Rule 10b–5, promulgated thereunder, 17 C.F.R. § 240.10b–5 (1986), the first of plaintiffs' causes of action that we will consider, six elements must be established. These necessary elements are: (1) a material misstatement or omission, (2) indicating an intent to deceive or defraud (scienter), (3) in connection with the purchase or sale of any security, (4) through the use of interstate commerce or a national securities exchange, (5) upon which the plaintiff detri-

mentally relied, and (6) that the fraud in fact caused the injuries. *Luce v. Edelstein,* 802 F.2d 49, 55 (2d Cir.1986); *Feinman v. Schulman Berlin & Davis,* 677 F.Supp. 168, 170 (S.D.N.Y.1988); *First Federal Savings & Loan Ass'n v. Oppenheim, Appel, Dixon & Co.,* 629 F.Supp. 427, 438 (S.D.N.Y.1986).

The motions to dismiss the Section 10(b) claims are founded on two grounds. First, the defendants, primarily the Andersen defendants, assert that the plaintiffs cannot state a claim under Section 10(b) because any misrepresentations in the offering materials are negated by the express language of the offering memorandum itself, the tax opinion letter and the report on the projections. While the Western defendants have also moved to dismiss for failure to state a claim,[4] they and all of the other groups of defendants have focussed primarily on the second ground for dismissal—that the plaintiffs have not adequately alleged the element of scienter as to each defendant or group of defendants, which will require us to examine the complaint pursuant to Fed.R.Civ.P. 9(b). We will examine the 9(b) arguments first.

### 1. *Rule 9(b) Motions*

■ Rule 9(b) requires that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Motive, intent, knowledge, and other conditions of mind of a person may be averred generally." The specificity requirement of Rule 9(b) has been found to serve several purposes: "(1) to provide a defendant with fair notice of the plaintiff[s'] claims, (2) to protect a defendant from harm to his or her reputation or goodwill, and (3) to reduce the number of strike suits." *Cosmas v. Hassett,* 886 F.2d 8, 11 (2d Cir.1989); (quoting *Stern v. Leucadia Nat'l Corp.,* 844 F.2d 997, 1003 (2d Cir.), *cert. denied,* —— U.S. ——, 109 S.Ct. 137, 102 L.Ed.2d 109 (1988)). Although each determination of compliance with Rule 9(b) "necessarily

rests on its particular facts," *Denny v. Barber,* 576 F.2d 465, 470 (2d Cir.1978), as a general rule, courts in this circuit have required that:

> [P]laintiff must specify: (1) precisely what statements were made in what documents or oral misrepresentations or what omissions were made, (2) the time and place of each such statement and the person responsible for making (or, in the case of omissions, not making) the same, (3) the context of such statements and the manner in which they misled the plaintiffs, and (4) what the defendants obtained as a consequence of the fraud.

*Todd v. Oppenheimer & Co., Inc.,* 78 F.R.D. 415, 420–21 (S.D.N.Y.1978); *see also Posner v. Coopers & Lybrand,* 92 F.R.D. 765, 769 (S.D.N.Y.1981), *aff'd,* 697 F.2d 296 (2d Cir.1982); *Fidenas A.G. v. Honeywell, Inc.,* 501 F.Supp. 1029 (S.D.N.Y.1980); *Gross v. Diversified Mortg. Investors,* 431 F.Supp. 1080, 1087–88 (S.D.N.Y.1977), *aff'd,* 636 F.2d 1201 (2d Cir.1980). A fraud complaint must also apprise each individual defendant of the specific nature of his or her participation in the fraud, *Sanderson v. Roethenmund,* 682 F.Supp. 205, 207 (S.D.N.Y.1988), particularly where there are multiple defendants. *DiVittorio v. Equidyne Extractive Indus. Inc.,* 822 F.2d 1242, 1247 (2d Cir.1987). These requirements have been applied stringently, especially where allegations of securities fraud are involved. *Tobias v. First City Nat'l Bank and Trust Co.,* 709 F.Supp. 1266, 1276–77 (S.D.N.Y.1989) (collecting cases). However, the Second Circuit has recently repeated its admonition that "a court must read the complaint generously, and draw all inferences in favor of the pleader." *Cosmas v. Hassett, supra,* 886 F.2d at 11, 12.

■ Although under the second sentence of Rule 9(b) a complaint need only aver intent generally, it must nonetheless allege facts which give rise to a strong inference that the defendants possessed the requisite fraudulent intent—either intent to defraud, knowledge of falsity, or reckless disregard

---

**4.** The World and Partnership defendants in the last page of their primary memorandum of law have adopted the arguments of all the other

defendants which are not inconsistent with their own.

for the truth. *Beck v. Manufacturers Hanover Trust Co.*, 820 F.2d 46, 50 (2d Cir.1987), *cert. denied*, 484 U.S. 1005, 108 S.Ct. 698, 98 L.Ed.2d 650 (1988), *overruled on other grounds, United States v. Indelicato*, 865 F.2d 1370 (2d Cir.1989) (en banc), *cert. denied*, — U.S. —, 110 S.Ct. 56, 107 L.Ed.2d 24 (1989). There are essentially two ways to establish a strong inference of scienter. A plaintiff may allege facts showing a motive for committing fraud and a clear opportunity for doing so. *Beck*, 820 F.2d at 50. Or, "[w]here motive is not apparent, it is possible to plead scienter by identifying circumstances indicating conscious behavior by the defendant, though the strength of the circumstantial allegations must be correspondingly greater." *Id.*

■ The specific requirements regarding exactly what statements were made, and when, where and by whom are "somewhat relaxed" when the complaint is based on an offering memorandum. *Stevens v. Equidyne Extractive Indus. 1980*, 694 F.Supp. 1057, 1061 (S.D.N.Y.1988). The memorandum "satisfies 9(b)'s requirements as to identification of the time, place, and content of the alleged misrepresentation ... Furthermore, no specific connection between fraudulent representations in the Offering Memorandum and particular defendants is necessary where ... defendants are insiders or affiliates participating in the offer of the securities in question." *Luce v. Edelstein, supra*, 802 F.2d at 55 (citations omitted). While it is clear that general partners offering limited partnerships are considered insiders for purposes of Rule 9(b), the standard is less clear with respect to other types of defendants, particularly professional defendants. *Stevens*, 694 F.Supp. at 1061.

■ There is, however, authority for the proposition that where counsel drafted the offering memorandum and were acting on behalf of the general partner, they are not, without more, corporate insiders or affiliates to whom the relaxed pleadings standards are applicable. *See DiVittorio, supra*, 822 F.2d at 1249; *Stevens*, 694 F.Supp. at 1062. Thus, they are not ordinarily liable for the general statements in the offering memorandum but rather plaintiffs must specifically attribute misstatements or omissions to them.

### (a) The Andersen defendants

■ Utilizing this as the standard for both groups of professional defendants, *see Stevens*, 694 F.Supp. at 1062, we determine that plaintiffs have specifically attributed statements to the Andersen defendants such that the time and place elements of 9(b) are satisfied. For example, the Andersen defendants performed two tasks in connection with the AWNLP offering memorandum: they prepared financial projections and compilation reports (based upon assumptions provided by the general partner) as well as a tax opinion letter analyzing the tax implications of the investment. Plaintiffs contend that both the tax opinion letter and the projections were materially false and misleading at the time they were made. The Andersen defendants argue, however, that plaintiffs have failed to allege facts which give rise to a strong inference of scienter, as required in this Circuit. Reading the complaint generously, we agree that plaintiffs have not alleged facts which give rise to a strong inference that the Andersen defendants possessed the requisite fraudulent intent. Taking the allegations as true that the Andersen defendants, in preparing the tax opinion letter and the projections, failed to disclose (1) the falsity of the World Information Systems ("W.I.S.") appraisal of the nursery business sold to AWNLP, ¶ 93(1); (2) the unreasonableness of the assumptions upon which the projections were based, ¶ 93(f); (3) the formulas and methods of calculation of the projections, ¶ 93(g), (4) the fact that the nursery business was failing at the time of the sale to the AWNLP, ¶ 93(r), (t), (u), and (5) the large projected operational expenses for 1985, ¶ 93(cc), we believe that the allegations as to the Andersen defendants' state of mind are merely conclusory and that there are no factual allegations which indicate that they knew of the alleged "unreasonableness" of the assumptions, the "falsity" of the appraisal, and the

"fact" that the nursery business was "failing."

There is no indication in the complaint of *how* or *when* either the Andersen firm or defendant Faggen supposedly knew that the projections were indeed based upon unreasonable assumptions and that the appraisal was incorrect and misleading. While the complaint repeatedly alleges that all of the defendants knew or should have known that the appraisal of the nursery business was inaccurate "because of each defendant's experience, skill, expertise and training," ¶¶ 61, 62A, 63 and 94, it does not allege that Andersen or Faggen had anything to do with the appraisal, or indeed, that they had any reason to know or believe that it was inaccurate. For example, it is not alleged that they had access to specific information showing that the appraisal was wrong. Nor is it alleged that they conducted an audit from which they should have learned that the appraisal or other documents provided by the general partner were false. Although it is alleged that the accounting firm of Peat Marwick conducted an examination in November of 1983 of the financial condition of the nursery business as of the year ending 1982, which examination was not completed, and that Peat Marwick's work papers show that Peat Marwick found some accounting irregularities, ¶¶ 54, 57, significantly, plaintiffs have not alleged that Andersen ever reviewed Peat Marwick's work papers. Even if the Andersen defendants had conducted a full audit, it is well settled that an inference of fraud does not arise from the mere fact that an auditor reported on allegedly inaccurate data. *The Limited, Inc. v. McCrory Corp.*, 683 F.Supp. 387, 394 (S.D. N.Y.1988); *see Dannenberg v. Dorison*, 603 F.Supp. 1238, 1241 (S.D.N.Y.1985); *Ross v. Warner*, 480 F.Supp. 268, 272 (S.D. N.Y.1979). Furthermore, a purported failure to investigate "[does] not rise above the level of negligence, which is legally insufficient." *O'Brien v. National Property Analysts Partners*, 719 F.Supp. 222, 229 (S.D.N.Y.1989) (quoting *The Limited, Inc.*, 683 F.Supp. at 394).

Although proof of reckless conduct will satisfy the scienter requirement, *see Goldman v. McMahon, Brafman, Morgan & Co.*, 706 F.Supp. 256, 259 (S.D.N.Y.1989), and despite the fact that "an egregious refusal to see the obvious, or to investigate the doubtful may, in some cases, give rise to an inference of gross negligence which can be the functional equivalent of recklessness," *see id.*, we do not believe there are any allegations in the complaint from which we can infer either gross negligence or recklessness.

Furthermore, as to the alleged failure to disclose some of the operating expenses, there is no indication that these figures were provided by the general partner to the Andersen defendants in the first place, and thus we cannot infer that the Andersen defendants knowingly failed to disclose them to the limited partners. The same can be said with respect to the allegation that the Andersen defendants knowingly failed to disclose the prior unsuccessful history of the nursery business.

Finally, with respect to the Andersen defendants' intent, we find that the alternative method of demonstrating scienter—motive—has not been established. Plaintiffs contend that the Andersen defendants were motivated to participate in the fraud because of personal gain. However, they have alleged no gain other than the fact that the Andersen firm was compensated for its professional services. It would defy common sense to hold that the motive element of the *Beck* scienter analysis would be satisfied merely by alleging the receipt of normal compensation for professional services rendered, because to do so would effectively abolish the requirement, as against professional defendants in a securities fraud action, of pleading facts which support a strong inference of scienter. *Cf. Wilson v. Saintine Exploration and Drilling Corp.*, 872 F.2d 1124 (2d Cir.1989) (holding that professional defendants who merely perform their usual professional functions and receive their normal compensation are not liable under the "draconian" provisions of Section 12(2)). Accordingly, the Section 10(b) claim is dismissed with respect to the Andersen defendants for

failure to adequately plead the element of scienter.[5]

### (b) The Friedman & Shaftan defendants

■ As to the other professional defendants, the attorneys, we conclude that the Section 10(b) claims are also not adequately pled pursuant to Rule 9(b) of the Federal Rules of Civil Procedure.

First, plaintiffs have not satisfied the rule that each of the Friedman & Shaftan defendants be given notice of the specific allegations against him, her or it. *DiVittorio, supra*, 822 F.2d at 1247. Although plaintiffs have sued the Friedman firm itself (Friedman & Shaftan, P.C.), plaintiffs have also joined the professional services corporations's shareholders, Wilfred T. Friedman, Michael E. Greene and Marcia Shaftan as executrix of the Estate of Robert P. Shaftan. The complaint, however, constantly refers to "Friedman & Shaftan" without indicating who did what and when. Furthermore, where the plaintiffs have attempted to identify acts of the individual defendants, they were unsuccessful in so doing. For example, in paragraph 26, it is alleged that Friedman & Shaftan, through Shaftan and Greene, "engaged in a high degree of individual effort to sell interests

in AWNLP" and that they answered plaintiffs' inquiries and assured plaintiffs of the bona fides, inducing them to purchase interests. However, even if we assume that the attorney defendants are "insiders" for *Luce* purposes, this paragraph alleges misrepresentations and conduct not tied to the offering memorandum, and therefore, specificity as to time, place and the content of the alleged misrepresentations is required. *See Tobias v. First City Nat'l Bank and Trust Co.*, 709 F.Supp. 1266, 1277 (S.D.N.Y.1989). Since paragraph 26 contains no such specificity, we conclude that these allegations are inadequately pled.

With regard to the allegations concerning the preparation of the offering memorandum itself, as we stated above, counsel who merely draft the memorandum cannot be held liable for the general statements in the offering memorandum not specifically attributed to them. See *supra* at 531. Thus, plaintiffs must plead the time, place and content requirements of Rule 9(b). Plaintiffs do not attribute any specific misrepresentations to counsel; indeed, with respect to the tax assistance letter and the opinion regarding the legality of the partnership units provided by the law firm, the only parts of the memorandum which argu-

---

**5.** Dismissal of the primary liability on the ground of failure to allege adequately the requisite fraudulent intent also requires us to dismiss the aiding and abetting claim. As stated in *Bloor v. Carro, Spanbock, Londin, Rodman & Fass*, 754 F.2d 57, 62 (2d Cir.1985), a plaintiff bringing an aiding and abetting claim must show: (1) the existence of a securities law violation by the primary (as opposed to the aiding and abetting) party; (2) "knowledge" of this violation on the part of the aider and abettor; and (3) "substantial assistance" by the aider and abettor in the achievement of a primary violation. Plaintiffs must satisfy the 9(b) requirements when pleading aiding and abetting of securities fraud, see *Goldman v. McMahon, Brafman, Morgan & Co.*, 706 F.Supp. at 260. As plaintiffs failed to show a sufficient basis to support an inference that the Andersen defendants were, at least, reckless in their preparation of the projections or the opinion letter, they likewise fail to satisfy the knowledge element necessary to predicate a claim for aiding and abetting. See *id.*

Furthermore, the common law conspiracy allegations must also be dismissed for this same deficiency. In order to establish liability for a

conspiracy to commit fraud, "a plaintiff must plead and prove (1) an agreement between the conspirator and the wrongdoer; and (2) a wrongful act committed in furtherance of the conspiracy." *Bresson v. Thomson McKinnon Securities Inc.*, 641 F.Supp. 338, 348 (S.D.N.Y. 1986). "[A] bare bones statement of 'conspiracy' ... without any supporting facts permits dismissal." *Heart Disease Research Foundation v. General Motors Corp.*, 463 F.2d 98, 100 (2d Cir.1972). Accordingly, "[a] claim of conspiracy to defraud must allege, *inter alia*, facts sufficient to support a finding of an agreement among those alleged to be a part of the conspiracy." *Troyer v. Karcagi*, 476 F.Supp. 1142, 1153 (S.D.N.Y.1979). "'Conspiracy liability will require knowledge plus an agreement with the wrongdoer.'" *Id.* (citation omitted); *see also Terra Resources I v. Burgin*, 664 F.Supp. 82, 89 (S.D.N.Y.1987) (conspiracy to defraud requires knowledge of the underlying scheme). Thus, even if we assume *arguendo* that an agreement is sufficiently pled, because plaintiffs did not adequately allege the scienter of the Andersen defendants, they cannot be held liable as co-conspirators.

ably contain representations from Friedman & Shaftan to the limited partners, no breach is alleged.

Even if we assume *arguendo* that the attorneys are insiders for *Luce* purposes, the allegations are deficient with respect to the scienter element. Plaintiffs have not pled facts which would fairly support a strong inference that any of the attorney defendants, either the firm itself or the named individuals, acted with an intent to defraud, or at least with reckless disregard for the truth. *Beck, supra,* 820 F.2d at 50. Assuming that the offering memorandum contained false and misleading information, plaintiffs do not allege any specific facts as to how and when any of the Friedman & Shaftan defendants learned that the offering memorandum contained such false and misleading information. *Devaney v. Chester,* 813 F.2d 566, 568–69 (2d Cir.1987); *Vereins–Und Westbank AG v. Carter,* 639 F.Supp. 620, 623 (S.D.N.Y.1986). There are no allegations that they had any specific communications or that they had met with any specific individuals, which facts would have created the necessary strong inference that each of the attorney defendants had the requisite fraudulent intent. *Schwartz v. Novo Industries, A/S,* 658 F.Supp. 795, 799 (S.D.N.Y.1987). We will not assume that clients as a matter of course communicate their allegedly fraudulent schemes, in whole or in part, to their attorneys. Furthermore, the mere fact that the Friedman firm had worked with the defendant Finesod on other offerings in the past does not raise a strong inference of fraud here in that plaintiffs do not allege that the Friedman & Shaftan defendants were ever accused of or determined to have committed any wrongdoing with respect to any of the prior tax shelters. *Dannenberg v. Dorison,* 603 F.Supp. 1238, 1241 (S.D.N.Y.1985).[6]

 In addition, we conclude that the entire complaint does not state a claim against Wilfred Friedman under either New York or federal vicarious liability principles. New York's Business Corporation

Law § 1505(a) provides that "[e]ach shareholder, employee or agent of a professional service corporation shall be personally and fully liable and accountable for any negligent or wrongful act or misconduct committed by him or by any person under his direct supervision and control while rendering professional services on behalf of such corporation." (McKinney's 1986). While plaintiffs allege that defendants Shaftan and Greene worked on the offering memorandum and/or participated in the offering, they do not allege any such work by attorney Friedman or any direct supervision or control by him over the others. Accordingly, reading the plain words of the statute, *We're Associates v. Cohen, Stracher & Bloom,* 65 N.Y.2d 148, 151, 490 N.Y.S.2d 743, 744, 480 N.E.2d 357 (1985), the complaint does not state a claim under New York law on the part of Wilfred Friedman. Federal law, 15 U.S.C. § 78t(a), dictates the same result, for in order to be held liable as a "control person" there must be facts alleged supporting an inference of knowledge or reckless disregard of the fraud, *see Harrison v. Enventure Capital Group, Inc.,* 666 F.Supp. 473, 478–79 (W.D.N.Y. 1987); *O'Connor & Assocs. v. Dean Witter Reynolds, Inc.,* 529 F.Supp. 1179, 1195 (S.D.N.Y.1981), and the defendant must "in some meaningful sense" be a culpable participant in the fraud perpetrated. *See Lanza v. Drexel & Co.,* 479 F.2d 1277, 1299 (2d Cir.1973) (en banc).

To summarize, the Section 10(b) claims are dismissed as to all of the Friedman & Shaftan defendants for failure to plead scienter, and the entire complaint is dismissed as to Wilfred Friedman for failure to plead facts alleging supervision or control.

### *(c) The Bryce Corporation*

 As to the defendant Bryce Corporation, we also conclude that the plaintiffs' complaint is inadequately pleaded pursuant to Rule 9(b). The only specific allegations in the complaint directed at Bryce are in paragraphs 6F, 42, 43, and 45. These alle-

---

**6.** The aiding and abetting and conspiracy allegations against the attorney defendants fail for the

same reasons articulated with reference to the Andersen defendants, *supra* footnote 5.

gations do not, however, attribute any particular misrepresentation or fraudulent act or omission to defendant Bryce. Furthermore, the plaintiffs concede that Bryce is not a "Western Seller," ¶ 6A, and therefore the allegations regarding fraud by the Western Sellers are not applicable to Bryce. Moreover, accepting the allegations against Bryce as true, there are no facts in the complaint from which we could draw any inference, let alone a strong one, that Bryce knew of any fraud. As eloquently stated by Judge Leisure, "plaintiffs cannot satisfy Rule 9(b) by masking the lack of factual allegations against each defendant through broad allegations which combine the acts of several defendants to create the impression that all engaged in every aspect of the alleged fraud." *O'Brien v. National Property Analysts Partners*, 719 F.Supp. 222, 229 (S.D.N.Y. 1989). Therefore, we reject plaintiffs' attempt in their memorandum in opposition to insert the name "Bryce" where the complaint does not do so and where the complaint indicates involvement of parties other than Bryce, such as the Western Sellers. Accordingly, the section 10(b) claims against Bryce are dismissed.

### (d) The Western, World and Partnership defendants

▆ With regard to the Western defendants, we conclude that the Section 10(b) claims are adequately pleaded. Plaintiffs allege that defendants Kindor and Tyler, who are alleged to control the rest of the Western defendants, conceived the scheme to defraud because they needed to mollify other investors. ¶ 40. Kindor and Tyler are alleged to have persuaded Finesod, Haber and Minars (of the World and Partnership defendants) to join in a fraudulent scheme, ¶ 46, whereby the nursery business would be resyndicated to a new limited partnership. ¶ 41. Specifically, plaintiffs allege that all of the above parties agreed to structure the sale of the nursery business from the Western Sellers to AWNLP "at an inflated purchase price through the use of a false appraisal and the use of World Nurseries as a sham intermediary purchaser." ¶ 47. Each of

these defendants was motivated by the ability to earn immediate cash profits and the Western defendants were further motivated by the ability to "mollify" their other investors. Furthermore, we find that there was a clear opportunity to commit fraud. *Beck, supra,* 820 F.2d at 50.

Although the Western defendants claim that they had no duty to disclose anything to the plaintiffs and therefore that they cannot be held liable under Section 10(b), we conclude that they may indeed be held liable for they are alleged to be parties to the purchase or sale, to have substantially participated in the concealment of material facts, or in the alternative to have been aiders and abettors to the sale. *See Murphy v. McDonnell & Co., Inc.,* 553 F.2d 292, 295 (2d Cir.1977). For example, the Western Sellers are alleged to have created the scheme, and despite their protestations to the contrary, to have assisted in the preparation of the offering materials. They are also alleged to have knowingly provided the sham appraisal and other false information, which they knew were either to be the basis for the projections or actually used in the offering memorandum. Furthermore, paragraph 93 is replete with allegations of their acts or omissions from which we can infer that the Western defendants acted with the requisite fraudulent intent both with respect to the projections and other fraud. For example, paragraph 93(m) essentially alleges that the Western defendants "cooked the books" by including sham purchase orders. Paragraph 93(*o*) alleges that the Western Sellers prematurely shifted plants to over-sized containers for sale to AWNLP to inflate their market value. Paragraph 93(w) accuses the Western defendants of artificially inflating receivables. Paragraphs 93(n) and (s) allege that the Western Sellers prepared the sham customer list attached to the offering memorandum. Accordingly, the Western defendants motion to dismiss pursuant to Rule 9(b) is denied.

As to the World and Partnership defendants, many allegations described above also support an inference that the World and Partnership defendants acted with the

requisite fraudulent intent, particularly the fact that Finesod and Haber were able to realize an immediate cash profit of $3.57 million, ¶¶ 53, 48, in the resale to AWNLP without any risk and without performing any function. ¶ 93(j). *Beck, supra,* 820 F.2d at 50 (inference of scienter where motive and clear opportunity to commit fraud). While it is true that the allegations regarding the procurement of the appraisal, ¶ 59, could probably be more particularly stated, we find that they are sufficient to give the World, Western and Partnership defendants notice of the acts for which plaintiffs seek to hold them liable. Furthermore, while it is true that these groups of defendants actually comprise over twenty individuals or entities, we cannot, at this point, in view of our obligation to accept the allegations in the complaint as true, dismiss any of these entities as not being controlled by or affiliates of either Kindor and Tyler or Haber and Finesod. Accordingly, in light of all of the foregoing and in view of the fact that the Partnership and World defendants are insiders, we find that the Section 10(b) fraud allegations are pleaded with the particularity required by Rule 9(b).

### 2. *Rule 12(b)(6)*

We will now address the Andersen, Western and World defendants' motions to dismiss pursuant to Rule 12(b)(6). In challenging the sufficiency of the complaint under rule 12(b)(6), the defendants bear the burden of proving that under no interpretation of the facts set forth in the complaint can the plaintiffs succeed. *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957). As expressed above, *supra* at 527, for the purposes of this motion, all of the plaintiffs' allegations are accepted as true, and no claim can be dismissed "unless it appears beyond doubt that the plaintiff[s] can prove no set of facts in support of [their] claim which would entitle [them] to relief." *Id.;* *Hughes v. Rowe,* 449 U.S. 5, 10, 101 S.Ct. 173, 176, 66 L.Ed.2d 163 (1980).

In these motions, the defendants assert that the plaintiffs cannot state a claim under Section 10(b) because any misrepresentations in the offering memorandum are negated by the express language of the offering memorandum itself, the tax opinion letter and the report on the projections. These defendants assert that there is a line of cases in this Circuit which holds that, as a matter of law, extensive cautionary language in the offering documents will preclude Section 10(b) claims based on those documents. *Luce v. Edelstein,* 802 F.2d 49, 56–57 (2d Cir.1986); *see also Feinman v. Schulman Berlin & Davis,* 677 F.Supp. 168, 170 (S.D.N.Y.1988); *Andreo v. Friedlander, Gaines, Cohen, Rosenthal & Rosenberg,* 651 F.Supp. 877, 881 (D.Conn. 1986). While we do not agree with the assertion that this line of cases precludes all claims of misrepresentation, we do recognize that it mandates dismissal of many of the Section 10(b) claims alleged here, specifically, those founded upon the projections and other expectations which were expressed in the offering memorandum or in the attachments thereto.

 Plaintiffs have requested that we defer this motion until the summary judgment phase of the case, citing *Devaney v. Chester,* 813 F.2d 566 (2d Cir.1987). *Devaney,* however, does not so require; it merely stands for the proposition that courts should not consider the reasonableness of plaintiffs' reliance on a Rule 9(b) motion, as the issue goes to the merit of the plaintiffs' claims. *Id.* at 569. *Devaney* does not preclude a court from deciding the reliance issue as a matter of law on a motion pursuant to Rule 12(b)(6). Indeed, it is well settled that although a Rule 12(b)(6) motion is addressed to the face of the pleading, the pleading has been interpreted by the Second Circuit as "includ[ing] any document attached to it as an exhibit or any document incorporated in it by reference." *Goldman v. Belden,* 754 F.2d 1059, 1065–66 (2d Cir.1985) (citations omitted). Here, the Memorandum is attached to the complaint as Exhibit A, to which, in turn, the tax opinion letter and the financial projections are appended as Exhibits B and F, respectively. It is clear from the papers submitted in this action that all parties

consider these voluminous documents to be part of the complaint, as do we.

Before we examine the arguments made by the defendants, we believe it is necessary to highlight the relevant portions of the offering memorandum and its attachments which will be applicable to such examination.

### (a) The Offering Materials

On the front page of the Offering Memorandum, in large bold and block letters, the following statement appears:

### THESE SECURITIES INVOLVE A HIGH DEGREE OF RISK

### (See "Risk Factors")

The next four pages of the Memorandum, which we will label the "foreword" section and which are paginated i-iv, contain very specific warnings, all of which are repeated in greater detail in the Memorandum itself. These cautionary instructions are also in block letters, and we will set forth those that are most germane to the instant action. For example, on page i, it is stated that "AN INVESTMENT IN THE PARTNERSHIP ENTAILS SIGNIFICANT RISKS." *SEE* "RISK FACTORS," AND "FEDERAL INCOME TAX FACTORS." This admonition continues by listing seven of the potential risks, including:

4. SUBSTANTIAL COMPENSATION WILL BE PAID TO WORLD NURSERIES AND ITS AFFILIATES IN CONNECTION WITH THIS OFFERING AND THE ACQUISITION OF THE NURSERY ASSETS BY THE PARTNERSHIP, INCLUDING SUBSTANTIAL COMPENSATION PAID FROM THE PROCEEDS OF THIS OFFERING.
5. POTENTIAL CONFLICTS OF INTEREST EXIST BETWEEN THE PARTNERSHIP AND THE GENERAL PARTNER, WORLD NURSERIES, BEARDSLEY AND THEIR AFFILIATES AND COUNSEL TO THE PARTNERSHIP.

\* \* \* \* \* \*

7. THERE ARE OTHER SUBSTANTIAL RISKS RELATING TO THE AVAILABILITY AND AMOUNT OF TAX BENEFITS RESULTING FROM AN INVESTMENT IN THE PARTNERSHIP. NO RULINGS HAVE BEEN SOUGHT FROM THE INTERNAL REVENUE SERVICE ("SERVICE") WITH RESPECT TO ANY OF THE TAX MATTERS DESCRIBED IN THIS MEMORANDUM. IF FOR FEDERAL INCOME TAX PURPOSES [one or more of seven enumerated events occurs], ALL OR A SUBSTANTIAL PART OF THE TAX BENEFITS DESCRIBED HEREIN WOULD NOT BE AVAILABLE TO THE INVESTORS. IN ADDITION, OTHER AUDIT ADJUSTMENTS MAY AFFECT BOTH THE TIMING AND THE AMOUNT OF THE TAX BENEFITS AVAILABLE.

Offering Memorandum at ii.

After these statements, specific and detailed warnings with reference to the tax opinion letter appear, after which the following, also in block letters, appears:

THE TAX OPINION IS NOT BINDING ON THE SERVICE OR ANY COURT OF LAW.

\* \* \* \* \* \*

NO REPRESENTATION OR WARRANTIES OF ANY KIND ARE MADE OR INTENDED, WITH RESPECT TO THE ECONOMIC RETURN OF THE TAX BENEFITS WHICH MAY ACCRUE TO INVESTORS. NO ASSURANCE CAN BE GIVEN THAT EXISTING TAX LAWS WILL NOT BE CHANGED OR INTERPRETED ADVERSELY. A CHANGE IN OR ADVERSE INTERPRETATION OF EXISTING TAX LAWS MAY DENY THE INVESTORS ALL OR A PORTION OF THE TAX BENEFITS CONSIDERED HEREIN.

EACH INVESTOR MUST CONSULT WITH HIS OWN COUNSEL AND OTHER ADVISERS WITH RESPECT TO THE TAX AND OTHER CONSEQUENCES OF AN INVESTMENT IN THE PARTNERSHIP, AND MUST REPRESENT THAT HE HAS DONE SO

PRIOR TO THE PURCHASE BY HIM OF ANY UNITS.

Offering Memorandum at iii.

The final cautionary words in the "foreword" section of the Memorandum relate to representations made by the general partner and other than the general partner. Basically, it is stated that only the general partner, and no one else, is authorized to supply potential investors with information. Further, there is a disclaimer that

ANY INFORMATION NOT SO SUPPLIED OR ANY STATEMENT NOT CONTAINED HEREIN CANNOT BE RELIED UPON AS HAVING BEEN AUTHORIZED BY THE PARTNERSHIP OR THE GENERAL PARTNER, ANY AFFILIATES OF THEM OR ANY PROFESSIONAL ADVISERS THERETO.

Offering Memorandum at iii. In addition, regarding the statements and representations made, there is a disclaimer that

THE STATEMENTS CONTAINED HEREIN ARE BASED ON INFORMATION BELIEVED BY THE GENERAL PARTNER TO BE RELIABLE. NO WARRANTY CAN BE MADE AS TO THE ACCURACY OF SUCH INFORMATION OR THAT CIRCUMSTANCES MAY NOT HAVE CHANGED SINCE THE DATE SUCH INFORMATION WAS SUPPLIED.

Offering Memorandum at iii-iv.

The "Risk Factors" section of the Offering Memorandum outlines in considerable detail (eleven pages), the potential risks of investing in the partnership. A number of the risks are then enumerated in further detail in other sections of the memorandum. In this section, the admonition is repeated that there is no representation made, nor can any be inferred, regarding the accuracy or completeness of the financial projections or the underlying assumptions. Offering Memorandum at 19. It is also stated in this section that there was no audit of the Partnership's financial statement performed by independent accountants, *id.* at 21, that there are or may be significant conflicts of interest between the "General Partner, the Partnership, World

Nurseries, Beardsley, the Manager, and their respective Affiliates and their counsel," *id.* at 18, that there are significant tax risks, *id.* at 22–27.

Regarding the existing or potential conflicts of interest, these are delineated, in detail, in one and one-half pages of the memorandum. Specifically relevant for the purpose of the pending motions is the statement therein that "[t]he terms of the [agreement between World Nurseries and the Partnership for the acquisition of the Nursery Assets by the Partnership] are *not the result of arm's length bargaining*, although certain terms included therein are based on the Western Agreement which was negotiated at arm's length between the Western Group and World Nurseries." Offering Memorandum at 51 (emphasis added). Also germane is the paragraph regarding the defendant Friedman & Shaftan's role, It provides in part that:

Friedman & Shaftan, P.C. is acting as counsel to the Partnership in connection with this Offering and may render future legal services to the Partnership. Friedman & Shaftan, P.C. has acted as counsel to World Nurseries and its Affiliates. *No independent counsel representing solely the Limited Partners has been involved in the negotiation of this offering or of the transaction proposed hereby and the partnership does not intend to retain such counsel in the future.*

*Id.* at 52 (emphasis added).

The actual Tax Opinion Letter issued by the defendant Arthur Andersen contained the following statement:

The tax analysis with which we concur is not binding on the Internal Revenue Service and *there can be no assurance that the service will not take a position contrary to any of the opinions expressed therein or that if the Service took such a position, it would not be sustained by the courts.* In addition, prospective investors are urged to seek the advice of their personal tax advisors. (emphasis added)

*Id.* Furthermore, on the subject of expected tax benefits, it was expressly stated in the introduction to the Federal Income Tax

Factors section of the Memorandum, on which the tax opinion is, in large part, based, that "there can be no assurance that some of the deductions and credits claimed by the partnership will not be challenged by the Service.... A PROSPECTIVE INVESTOR SHOULD OBTAIN PROFESSIONAL GUIDANCE FROM HIS OWN TAX ADVISER IN EVALUATING THE TAX RISKS INVOLVED." Offering Memorandum at 53 (emphasis in original). In this "Tax Factors" section of the memorandum, which comprises thirty four pages, numerous potential risks are enumerated and discussed in detail, and several possible resolutions by the IRS for each issue are presented. *Id.* at 53–86.

As for the Financial Projections prepared by the Andersen defendants, they contain the express admonition that they

> were generated based on these assumptions and upon appraisals of the nursery items as well as the sales of the nursery items. Some assumptions may not materialize, and unanticipated events and circumstances may occur subsequent to the date of the projections. Accordingly, the actual results achieved during this projection period may vary from the projections and the variations may be substantial.

*Id.* The cover letter which accompanied the projections, dated December 14, 1984, likewise states that the projections "are based on appraisals, assumptions and estimates which were made by the representatives of Arizona World Nurseries Limited Partnership...." The letter further states that Andersen's sole undertaking with respect to the projections was to satisfy itself "as to the mathematical accuracy of the projections and that they fairly reflect the estimates and assumptions contained therein." The letter then recites extremely explicit warnings as to the accuracy and achievability of the projections:

> The selection of estimates and assumptions requires the exercise of judgment and is subject to uncertainties relating to the effect that changes in legislation or economic or other circumstances may have on future events. *There can be no assurance that the assumptions or data upon which they are based are accurate. Variations of such assumptions could significantly affect the projections.* To the extent that the assumed events do not occur, the outcome may vary significantly from that projected. *Accordingly, we express no opinion on the achievability of the results presented in the projections, and no representation to the contrary may be made or implied.* (emphasis added)

The Subscription Agreement, located at Exhibit J to the Offering Memorandum, signed by each of the plaintiffs, contains the following relevant representations and warranties by the investors: "I have been informed that my investment is a high risk investment, and in evaluating such investment I have consulted with my own investment and/or legal and/or tax advisor" ¶ 2(c); "With respect to the tax and other legal aspects of my investment I have relied solely upon the advice of my own tax and legal advisors" ¶ 2(i); and "I recognize that the Partnership is newly organized and has no history of operations or earnings and is a speculative venture ...," ¶ 2(j).

Finally, we note that the Offering Memorandum fully discloses the details of the sale of the nursery from the Western Sellers to World Nurseries and the subsequent sale, two weeks later, by World Nurseries to the Partnership, including the $11 million step-up in purchase price from World Nurseries to the Partnership. Offering Memorandum at 36–37. In fact, plaintiffs' complaint pleads the details of the sale and cites to the offering memorandum, thus implicitly conceding that there was indeed full disclosure of the sales.

### (b) Analysis

In view of all of the foregoing warnings and cautionary language contained in the tax opinion letter, the projections, and the offering memorandum itself (particularly the foreword and tax factors sections), we conclude that *Luce* and its progeny are applicable here so as to preclude liability for misrepresentations regarding expected or future tax benefits or

profits. In fact, *Luce* specifically involved allegations that statements in the offering memorandum regarding financial projections of future cash flow and expected tax benefits were materially misleading. *Luce v. Edelstein*, 802 F.2d at 56–57. The projections in *Luce*, like those in issue here, contained warnings that they were "necessarily speculative in nature," that "[n]o assurance [could] be given that these projections [would] be realized," and that "[a]ctual results may vary from the predictions and that these variations may be material." *Luce, supra*, at 56. Accordingly, the *Luce* court stated that it "was not inclined to impose liability on the basis of statements that clearly 'bespeak caution' ". *Id.*

Relying on *Luce*, the court in *Feinman v. Schulman Berlin & Davis*, 677 F.Supp. 168, 170–71 (S.D.N.Y.1988), rejected plaintiffs' Section 10(b) claims relating to projected tax benefits. There, after detailing the cautionary language in the offering memorandum, which we note is quite similar to that in issue here, the court stated that the "offering memorandum warned plaintiffs not to rely on the misrepresentations which the defendants allegedly made. Plaintiffs' reliance on these representations, if made, was unjustified and dismissal is appropriate." *Id.* at 171. *See also Andreo v. Friedlander, Gaines, Cohen, Rosenthal & Rosenberg*, 651 F.Supp. 877, 881 (D.Conn.1986) (dismissing Section 10(b) claims because "the language of the document in question limited the degree to which investors should rely on it").

The projections in issue here make clear that they "are based upon assumptions made by Arizona World Nurseries Limited Partnership of the income and expenses and cash flow from the operations of the nursery." Offering Memorandum, Ex. F: "Notes and Assumptions" section of the Financial Projections at 1. Furthermore, the projections expressly cautioned that they were based upon these assumptions and appraisals, and that some of the assumptions may not materialize, and thus, that the actual results achieved could then vary from the projections substantially. In addition, the cover letter which accompanied the projections made clear the limited role that the Andersen defendants assumed with reference to the projections (that they did not perform an audit and that they did not verify the assumptions provided by the general partner), and once again, explicitly warned, as set out above, as to the accuracy and achievability of the projections. Certainly, then, no misrepresentation claim can be predicated upon the fact that the projections did not bear out. *Luce, supra*, at 57; *Feinman, supra*, at 170–71; *Andreo, supra*, at 881–82.

Likewise, the tax opinion letter states only that Andersen had "reviewed" the material in the private offering memorandum, and particularly the "Federal Income Tax Factors" section (which we note includes a lengthy discussion of the deductibility of the purchase price of the nursery stock and the potential challenges by the IRS). Based on this review, Andersen had determined that, in its opinion, "all material Federal tax issues have been considered and have been fully and fairly discussed," that "the Partnership will more likely than not prevail on each material tax issue presented," and that "in the aggregate the tax benefits of an investment in the Partnership will more likely than not be realized." Offering Memorandum, Ex. B. Andersen never stated that the limited partners were certain to receive their desired tax deduction; rather, the accountants issued warnings to the contrary, as set forth in full above. It is clear, from the tax opinion letter, the Tax Factors section of the offering memorandum, and the warning pages in block letters in the "foreword" section of the memorandum, that no assurances were made by the Andersen defendants regarding the availability of the deductions or the accuracy of the appraisal.

Furthermore, as can be seen from the warnings in the front of the offering memorandum also quoted above, as well as the "Tax Risks" section of the Memorandum, and as stated on page two of the tax opinion letter, Andersen relied on the factual information provided to it by the management of the partnership. Tax Opinion Letter at 2 (Andersen "relied on management and their legal counsel for business and

legal matters"); Offering Memorandum at 22 ("INVESTORS ARE CAUTIONED THAT THE CONCLUSIONS IN THE TAX OPINION ARE BASED UPON CERTAIN REPRESENTATIONS TO ARTHUR ANDERSEN BY THE GENERAL PARTNER"). We conclude that, given all of the cautionary language, Andersen's tax opinion cannot be read to mean that Andersen undertook to make representations of any kind regarding the value of the nursery stock. Furthermore, we find that, to the extent that plaintiffs relied on the tax opinion letter as representing otherwise, such reliance was not reasonable. Thus, plaintiffs cannot state a claim based upon the fact that the IRS disallowed the deductions.

Accordingly, those Section 10(b) claims that must be, and are hereby, dismissed against all the defendants are the claims of misrepresentation based on the future expectations and performance of the limited partnership contained in the offering memorandum or its attachments. The warnings and disclaimers discussed above clearly limited the degree to which an investor could reasonably rely on these documents as a forecast of the *future. Luce v. Edelstein*, 802 F.2d at 56–57.

■ We believe, however, that there are several asserted misrepresentations that can not be dismissed on the instant record. For example, the cautionary language may not be sufficient to disclaim liability on the part of either the World, Partnership or Western defendants for the misrepresentations, omissions and fraudulent conduct regarding the *then-existing* condition and value of the nursery business, to wit: the nursery stock and plant materials, the equipment, the customer lists and so forth, as the disclamatory language quoted above states that the projections were based on the appraisal procured by the World and Western defendants and on assumptions provided by the general partner. All of the Section 10(b) claims regarding then-existing misrepresentations are, however, dismissed as to the Andersen defendants, *see Andreo*, 651 F.Supp. at 881, as well as the Friedman & Shaftan defendants and the Bryce Corporation, because of both the limited role, if any, these defendants had regarding the documentation and authentication of the then-existing conditions and value, and our conclusion above that the scienter element was not properly pleaded with respect to these three groups of defendants. On the other hand, claims of misrepresentation relating to then-existing conditions and value are sustained for the purposes of the present motion as to the World, Partnership, and Western defendants.

## B. LIABILITY UNDER SECTION 12(2) OF THE SECURITIES ACT

■ Section 12(2) of the Securities Act provides purchasers with a cause of action against a person who "offers or sells a security" by means of a defective prospectus. 15 U.S.C. § 77$l$(2). If a security is sold "by means of" a misstatement or omission, the purchaser may tender the security to the seller and recover the purchase price plus interest, less income, or if the purchaser no longer owns the security, he or she may recover equivalent rescissory damages. *Randall v. Loftsgaarden*, 478 U.S. 647, 655–56, 106 S.Ct. 3143, 3148–49, 92 L.Ed.2d 525 (1986). There is no need for reliance by the plaintiffs on the misrepresentation, L. Loss, *Fundamentals of Securities Regulation* 889 (2d ed. 1988) (citing, *inter alia, Wigand v. Flo–Tek, Inc.*, 609 F.2d 1028, 1034 (2d Cir.1979)), and there is no need for plaintiffs to establish a causal connection between the misrepresentation and the damage suffered, if any. *Loss, supra; see also Wilson v. Saintine Exploration and Drilling Corp.*, 872 F.2d 1124, 1127 (2d Cir.1989).

Plaintiffs here allege that all of the defendants are statutory sellers of the limited partnership interests, or in the alternative, that they are aiders and abettors to a statutory seller. The Second Circuit has held that "persons who do not meet the *Pinter* test for statutory sellers may not be held liable under Section 12 as aiders and abettors." *Wilson, supra*, 872 F.2d at 1127 (construing *Pinter v. Dahl*, 486 U.S. 622, 108 S.Ct 2063, 2083, 100 L.Ed.2d 658 (1988) (which interpreted Section 12(1))). Accordingly, unless we find a defendant or a

group of defendants to be a "statutory seller," the definition of which has been expanded by the Second Circuit in its interpretation of *Pinter v. Dahl*, the Section 12(2) claims ought to be dismissed as to that defendant or group of defendants. In addition, most of the defendants claim that the Section 12(2) claims are not timely, another issue which we must address.

### 1. *Statutory Seller*

■■■■■ A statutory seller under Section 12(2) is one who is alleged to have sold, offered to sell, or solicited the sale of the securities for financial gain. *Wilson*, 872 F.2d at 1126 (applying the Section 12(1) analysis of *Pinter* to Section 12(2)). There is no need to prove scienter or loss causation in order to hold a statutory seller liable. *Id.* Thus, it is clear that any person or entity that passes title or offers to pass title in a security for value may be found liable. The question of when a party will be liable for solicitation is somewhat murkier. As stated in *Wilson*,

it is not solicitation to recommend the purchase of a security to benefit the buyer. "[L]iability extends *only* to the person who successfully solicits the purchase, motivated at least in part by a desire to serve his own financial interests or those of the securities owner." *Id.* at 2079 (emphasis added) [quoting *Pinter*, 108 S.Ct. 2063, 2079]. It also is clear that mere participation in the solicitation by another is not solicitation, *id.* at 2081 n. 27, which is why the lawyers performing "only . . . their professional services" are not liable under § 12. *Id.* at 2081. The proper focus of the analysis appears to be on the "defendant's relationship with the plaintiff-purchaser", rather than "the defendant's degree of involvement in the securities transaction and its surrounding circumstances." *Id.*

*Wilson*, 872 F.2d at 1129 (Timbers, J., dissenting).

■■■■ Under this analysis, we conclude, for the reasons immediately following, that the plaintiffs have not stated a claim under this section as against the Andersen defen-

dants, the defendant Bryce, or the Friedman & Shaftan defendants.

With respect to the Andersen defendants, only paragraph 19B of the complaint could possibly be construed to allege solicitation. However, neither relevant subparagraph, (i) or (iii), does so with the particularity required by Rule 9(b), the standards of which were set out above. For example, it is alleged that certain Andersen partners assisted the brokers in the sale of the interests; however, when or where such "assistance" was rendered and to whom exactly is not alleged. Essentially, this assertion constitutes an allegation that the Andersen defendants assisted the solicitation efforts of another, which the Supreme Court has held to be insufficient to allege seller status. *Pinter v. Dahl*, 108 S.Ct at 2081 n. 27 (interpreting Section 12(1), but applied by the Second Circuit to Section 12(2)).

Furthermore, although it is alleged that "Andersen engaged in a high degree of effort to sell the securities through the [ ]identified partners, and was in actual contact with investors and their representative", this allegation fails since it does not identify the statements themselves, the time and place they were made, or the investors. We do not even know that any of the plaintiffs in this action comprise the investors purportedly in contact with the Andersen defendants. Finally, plaintiffs have not satisfied the element in *Wilson* that requires the solicitation "for a financial gain." *Id.* at 1126. The *Wilson* court stated that "the draconian provisions of Section 12 must not be extended to include [professionals] who have performed only their usual professional functions in preparing documents for an offering." *Id.* Other than the usual fees for professional services rendered in connection with the provision of the tax opinion letter and the projections, no financial gain, *i.e.*, commissions or finders' fees, is alleged. Accordingly, we dismiss the Section 12(2) claim as to the Andersen defendants.

As to the defendant Bryce Corporation, the foregoing analysis also applies. Although Bryce is alleged to have been eligible to receive a finders' fee from the West-

ern defendants for "finding" the World defendants, ¶¶ 42, 43, there are no allegations that Bryce in any way sold limited partnership interests to, or solicited such sales of, any of the plaintiffs. Therefore, the Section 12(2) claim is dismissed as against Bryce.

The above analysis is also germane with respect to the Friedman and Shaftan defendants. Although plaintiffs attempt to allege "solicitation for financial gain" by the allegation in paragraph 109 that "Friedman & Shaftan received sales commissions in connection with its finding investors to become limited partners in AWNLP," this paragraph, like paragraph 26 discussed *supra*, at 533-34, is not sufficiently particular under Rule 9(b) as there are no facts alleged which support it. For example, plaintiffs have not alleged that any of the Friedman & Shaftan defendants introduced any of the plaintiffs to the general partner or actually "brokered" the sale of any of the AWNLP interests. This is information which the plaintiffs have access to and which should have been alleged. Accordingly, we dismiss the Section 12(2) claim against the Friedman & Shaftan defendants.[7]

It is clear that the Section 12(2) claim cannot be dismissed against either the World or Partnership defendants on the grounds that they were not statutory sellers. In fact, these defendants have not addressed the claim in their briefs (save for the footnote to the conclusion that they join in the motions made by the other parties where they are applicable), indicating by their silence that they recognize that they could not prevail on the argument. Nor do the Western defendants argue that they are not statutory sellers [8]; rather, they argue only that the claim is pleaded deficiently in that the requirements of Section 13 of the Securities Act have not been met. Thus, we must now examine this assertion

before we can determine whether the plaintiffs have stated section 12(2) claims against the World, Partnership, and Western defendants.

### 2. *Statute of Limitations*

Section 13 of the Act provides that Section 12(2) allegations, even if otherwise sufficient, can state a cognizable claim only if they establish on their face that the claim was "brought within one year after the discovery of the untrue statement or omission or after such discovery should have been made by the exercise of reasonable diligence.... In no event shall any action be brought ... more than three years after the sale." It has been held that plaintiffs have the burden of pleading compliance with statute of limitations in Section 13, *Krome v. Merrill Lynch & Co. Inc.*, 637 F.Supp. 910, 914, *vacated in part on other grounds*, 110 F.R.D. 693 (S.D.N.Y.1986), and that a complaint which does not adequately do so is subject to dismissal. *Id.* at 913-15; *see Quantum Overseas N.V. v. Touche Ross*, 663 F.Supp. 658, 662 (S.D.N.Y.1987).

To satisfy Section 13, in addition to setting forth (1) the time and circumstances of the discovery of the allegedly fraudulent statements or omissions, plaintiffs must (2) plead facts demonstrating the efforts they made to discover the alleged fraud and (3) the reasons why they could not have done so sooner. *Sanderson v. Roethenmund*, 682 F.Supp. 205, 208 (S.D.N.Y.1988); *Quantum*, 663 F.Supp. at 662. Plaintiffs allege that they purchased their partnership interests, in reliance upon the allegedly false offering memorandum, in or around December 1984. ¶ 3. Thus, because more than one year from the commission of the fraud elapsed prior to plaintiffs' filing of this action, plaintiffs must plead their diligence. *Boley v. Pineloch Assocs., Ltd.*, 700 F.Supp. 673, 676 (S.D.N.

---

**7.** Even if we were to find these allegations of "solicitation for financial gain" sufficient, the Section 12(2) claim against the Friedman & Shaftan defendants would not pass muster under the analysis of Section 13, *infra* at 543-44, as plaintiffs have not sufficiently implicated them in the fraudulent concealment.

**8.** Whether or not these defendants are statutory sellers is a question we will leave for another day when the issue has been properly briefed.

Y.1988). As a preliminary matter, we observe that the Section 12(2) claims in the actions commenced after December 1987, three years after the sale of the securities, are untimely due to the absolute three year statute of limitations provided by Section 13. *Miller v. Grigoli*, 712 F.Supp. 1087, 1091 (S.D.N.Y.1989); *see also Krome v. Merrill Lynch & Co. Inc., supra*, 637 F.Supp. at 914 ("Where the very statute that creates the cause of action also contains a limitations period, the statute of limitations not only bars the remedy but also destroys the liability."). Thus, the Section 12(2) claims in the *Frost, LaCorte, Mills,* and *Clark* actions are time-barred. They are also time-barred under the one year provision of Section 13 as the latest date plaintiffs claim to have discovered the fraud is November of 1986. ¶ 112.

As to the plaintiffs in the original *Friedman* and *Schumate* actions (on whose behalf the consolidated complaint was filed), only twenty eight of these plaintiffs commenced an action in December 1986, two years after they purchased their interests in AWNLP by means of the allegedly fraudulent offering memorandum. All of the plaintiffs in the consolidated complaint assert that they failed to discover the fraud within one year of the sale because of the defendants' so-called "fraudulent concealment" as alleged in paragraphs 111–19. Allegations of fraudulent concealment, like all fraud allegations, must be stated with particularity. *Sanderson*, 682 F.Supp at 208 n. 7. If plaintiffs allege that discovery of the fraud was delayed by the actions of a particular defendant, they must set forth in the complaint the essential facts supporting such allegations. *Krome*, 637 F.Supp. at 914. Thus, the complaint must show that a particular defendant "took positive steps after the commission of the initial fraud to keep it concealed." *Id.*

We conclude that the plaintiffs have arguably satisfied the above standards of pleading fraudulent concealment against the Western, Partnership and World defendants due to the allegations in paragraphs 111, 113–116. These paragraphs specifically delineate how these defendants allegedly concealed the fraud from the plaintiffs. For example, although the allegations in paragraphs 111(a), 115, and 116 concern offerings in investment vehicles allegedly controlled by the Western defendants or the World defendants other than AWNLP, it is alleged that these investments were promoted to the plaintiffs. ¶ 111(a). Plaintiffs adequately explain why the offering memoranda for these investments precluded them from discovering the facts upon which their claims are predicated. Although certain of the allegations, such as those in paragraph 111(b), could be more precise, we believe that the fraudulent concealment section, taken as a whole, gives the World, Partnership, and Western defendants fair notice as to the plaintiffs' contentions and the grounds upon which they rest.

We acknowledge that we may not decide on a motion to dismiss whether or not the plaintiffs were indeed diligent, yet we must decide whether the issue has been properly pleaded. *Krome, supra* at 914; *Hill, supra* at 1388–89. Although we have concluded that fraudulent concealment is properly pleaded, we do not believe that plaintiffs have literally satisfied the other requirements of Section 13, as their allegations with respect to their efforts to discover the fraud are quite vague. For instance, it is not specifically alleged which plaintiffs "read information" sent by which defendants or what the information was, which plaintiffs actually visited the nursery and what those individuals saw that misled them in what way, and which retained "legal and financial advisors" and what the plaintiffs were told by them. Furthermore, it strains credulity to believe that all seventy plaintiffs performed all of these acts. Assuming for a moment that these allegations were adequately alleged and that a handful of the plaintiffs did all of these things, we cannot permit all of the plaintiffs to profit from the diligent efforts of but a few. At this point, however, we decline to dismiss the Section 12(2) claims against the Western, World and Partnership defendants on this ground, in light of

the fact that the fraudulent concealment is properly pleaded. *E.g., In re Gas Reclamation, Inc. Securities Litigation,* 659 F.Supp. 493, 508 (S.D.N.Y.1987); *see Boley, supra,* 700 F.Supp. at 677. We also recognize that the plaintiffs' own pleadings indicate several different dates that they could have discovered the fraud, to wit: February 7, 1986, the "middle of 1986", November of 1986, and December of 1986. Thus, although we decline to dismiss the Section 12(2) claims against them at this time, we anticipate further motion practice by the Western, World and Partnership defendants on the timeliness of this claim with respect to each plaintiff after discovery has concluded and the record is complete.

In sum, the Section 12(2) claims are dismissed with prejudice as against the Bryce, Andersen and remaining Friedman & Shaftan defendants, but retained as against the Western, World and Partnership defendants.

## C. LIABILITY UNDER SECTION 17(A)

 We have previously been confronted with the question of whether Section 17 of the Securities Act of 1933 provides for a private cause of action. In *Tobias v. First City Nat'l Bank and Trust Co.,* 709 F.Supp. 1266, 1274–76 (S.D.N.Y.1989), we recognized the split in authority in both the Circuit courts as well as the courts within the Southern District. After carefully reviewing the cases, we held that there is no implied right of action provided under Section 17. *Id.* We see no reason to depart from this conclusion at this time, and accordingly, plaintiffs' Section 17(a) claims are dismissed with prejudice.

## D. LIABILITY UNDER RICO

Plaintiffs' sixth claim for relief alleges violations of RICO, specifically 18 U.S.C. § 1962(a), (c) and (d), by all of the defendants. "The law surrounding the RICO statutory frame is a rapidly shifting, evolving corpus, whose practical interpretation presents a continual challenge to the courts." *Goldman v. McMahon, Braf-*

*man, Morgan & Co.,* 706 F.Supp. 256, 261 (S.D.N.Y.1989). Because *Beauford v. Helmsley,* 865 F.2d 1386 (2d Cir.1989) (en banc), *vacated for further consideration,* —— U.S. ——, 109 S.Ct. 3236, 106 L.Ed.2d 584 (1989), *upheld by* Order of September 15, 1989, *cert. denied,* —— U.S. ——, 110 S.Ct. 539, 107 L.Ed.2d 537 (1989) and *H.J. Inc. v. Northwestern Bell Telephone Co.,* —— U.S. ——, 109 S.Ct. 2893, 1899, 106 L.Ed.2d 195 (1989), redefined and recharacterized the standards for the enterprise, the pattern and continuity, we asked the parties to rebrief the portions of their motions concerning RICO in light of these changes.

Addressing first the claim under section 1962(c), it is well established that to state a cause of action under this section plaintiffs must show "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Sedima S.P.R.L. v. Imrex Co.,* 473 U.S. 479, 496, 105 S.Ct. 3275, 3284, 87 L.Ed.2d 346 (1985) (footnote omitted). Racketeering activity is the commission of certain predicate acts, specified in the statute, for which a defendant could be convicted, *id.* at 488, 105 S.Ct. at 3280, and a pattern of activity requires proof of at least two such acts, 18 U.S.C. § 1961(5), "that were related and that amounted to, or threatened the likelihood of, continued criminal activity." *H.J. Inc. v. Northwestern Bell Telephone Co.,* 109 S.Ct. at 1899.

All of the defendants originally based their motions to dismiss the RICO claims on (1) their assertions that plaintiffs had failed to adequately allege any predicate acts and (2) that the enterprise element was not adequately alleged.[9] In light of *Beauford* and *H.J. Inc.,* they continue to argue the former and, apparently conceding that the enterprise element is met, now claim that the pattern element is not alleged satisfactorily.

 Regarding the first argument for dismissal, we find that some of the defendants' motions must be denied and some must be granted. We reach this re-

---

**9.** Only the Friedman & Shaftan and World and Partnership defendants specifically addressed the other RICO claims alleged under Sections 1962(a) and (d).

sult based upon our conclusion that plaintiffs have stated some securities fraud violations only against some of the defendants, and because the plaintiffs allege that these violations (in addition to allegations of mail fraud) constitute the predicate acts of racketeering activity. Accordingly, the motions, made by the Western, World, and Partnership defendants, to dismiss the RICO claims for failure to adequately plead the predicate acts are denied, as plaintiffs have adequately pleaded the securities fraud predicates against these defendants. However, as we have dismissed plaintiffs' securities law claims against the Friedman & Shaftan defendants, the Andersen defendants and the Bryce defendants, and because we find that the elements of mail fraud [10] have not been adequately pleaded as against these defendants in that plaintiffs have not alleged facts giving rise to a strong inference of intentional fraud on the part of these defendants, *see Beck v. Manufacturers Hanover Trust Co., supra,* 820 F.2d at 49, we dismiss the Section 1962(c) claims against the Bryce, Andersen and Friedman & Shaftan defendants. *Moss v. Morgan Stanley Inc.,* 719 F.2d 5, 17–19 (2d Cir.1983), *cert. denied,* 465 U.S. 1025, 104 S.Ct. 1280, 79 L.Ed.2d 684 (1984).

◼ We turn now to the defendants' other chief ground for dismissal—that the plaintiffs have failed to allege predicate offenses possessing the "continuity" needed to establish a pattern of racketeering activity. We have already concluded that the Section 12(2) and certain of the Section 10(b) securities fraud predicates can not be dismissed as against the Western, World and Partnership defendants. Plaintiffs have alleged, in addition, that these defendants also committed mail fraud by "transmitt[ing] the Private Placement Memorandum to the plaintiffs at their residences or offices in the States hereinabove stated [in ¶ 4] in December, 1984." ¶ 147.[11] We find that the predicate acts of mail fraud are not deficient as against these same defendants, in light of our previous determination that plaintiffs have adequately pleaded scienter against these defendants, and our conclusion that plaintiffs have also adequately pleaded the other requirements of mail fraud—the existence of a fraudulent scheme and the use of the mails to further the scheme.[12]

◼ Although none of the defendants have raised the issue of whether there are at least two predicate acts charged, we believe it incumbent upon us to do so in light of a recent case in this district. In *Polycast Technology Corporation v. Uniroyal, Inc.,* 728 F.Supp. 926 (S.D.N.Y.1989), the Court, examined, apparently for the first time in this Circuit, the issue of whether two separate violations of the securities laws which arise from a single act, such as misrepresentations made in one document in connection with the purchase or sale of securities, can be regarded as charging two predicate acts. Finding no authority in this Circuit, the Court looked to cases in other circuits, and was persuaded by two cases in the Eighth and Ninth Circuits. *United States v. Walgren,* 885 F.2d 1417, 1425 (9th Cir.1989); *United States v. Kragness,* 830 F.2d 842, 861 (8th

---

10. In order to state a claim for mail fraud, plaintiffs must allege (1) the existence of a scheme to defraud; (2) defendant's knowing or intentional participation in that scheme; and (3) use of the interstate mails in furtherance of the fraudulent scheme. *See Beck v. Manufacturers Hanover Trust Co.,* 820 F.2d 46, 49 (2d Cir.1987), *overruled on other grounds, United States v. Indelicato,* 865 F.2d 1370 ((2d Cir.) (en banc), *cert. denied,* —— U.S. ——, 110 S.Ct. 56, 107 L.Ed.2d 24 (1989); *United States v. Von Barta,* 635 F.2d 999, 1005 n. 14 (2d Cir.1989), *cert. denied,* 450 U.S. 998, 101 S.Ct. 1703, 68 L.Ed.2d 199 (1981); *Soper v. Simmons Int'l, Ltd.,* 632 F.Supp. 244 (S.D.N.Y.1986).

11. Although plaintiffs also allege wire fraud, they do not specify any such wire transmissions. Because allegations of wire fraud must be pleaded with the specificity required by Rule 9(b), and in light of the fact that the time, place and content of such alleged wire transmissions have not been pleaded, we conclude that the wire fraud claims are deficient.

12. "Where one does an act with knowledge that the use of the mails will follow in the ordinary course of business, or where such use can reasonably be foreseen, even though not actually intended, then he 'causes' the mails to be used." *Pereira v. United States,* 347 U.S. 1, 8–9, 74 S.Ct. 358, 362–63, 98 L.Ed. 435 (1954).

Cir.1987). Although neither of these cases involved fraud in the sale of securities, it is true that both these cases stand for the proposition that it is not proper under RICO to charge two predicate acts where one action violates two statutes. *Walgren,* 885 F.2d at 1425; *Kragness,* 830 F.2d at 861. The *Polycast* opinion does not, however, discuss the cases in other circuits where the courts have held otherwise. *See, e.g., United States v. Watchmaker,* 761 F.2d 1459, 1475 (11th Cir.1985) (the standard is "whether each act constitutes a separate violation of the [state or federal] statute governing the conduct in question. If distinct statutory violations are found, the predicate acts will be considered distinct irrespective of the circumstances under which they arose."), *cert. denied,* 474 U.S. 1100, 106 S.Ct. 880, 88 L.Ed.2d 917 (1986); *see also United States v. Licavoli,* 725 F.2d 1040, 1046 (6th Cir.1984), *cert. denied,* 467 U.S. 1252, 104 S.Ct. 3535, 82 L.Ed.2d 840 (1984).

If we were to follow the position adopted in *Polycast,* then the Section 12(2) and Section 10(b) violations could be construed as only one predicate act in that they are both arguably based on the same set of misrepresentations in the offering memorandum. However, even assuming *arguendo* that these two violations only support one predicate act, there nonetheless appear to be at least two predicate acts charged in the consolidated complaint. First, we observe that in *Polycast,* there was only one plaintiff, *i.e.,* victim. Here, we have over seventy plaintiffs/victims (including those in the related cases), each of whom alleges securities fraud violations. Thus, even if there is only one predicate act per plaintiff for the securities violations, there are still more than seventy different predicate acts. *See United States v. Kaplan,* 886 F.2d 536, 541–42 (2d Cir.1989) (bribes offered to two persons in a conversation with one of them stated two predicate acts) *petition for cert. filed,* 58 U.S.L.W. 3431 (U.S. December 13, 1989) (No. 89–1000); *Beauford v. Helmsley,* 865 F.2d 1386, 1391–92 (2d Cir.1989) (en banc), *vacated for further consideration,* —— U.S. ——, 109 S.Ct. 3236, 106 L.Ed.2d 584 (1989), *upheld by* Order of

September 15, 1989 (finding each act of fraudulent mailing, over 8,000 of them, separately indictable and therefore sufficient to support independent predicate acts); *United States v. Indelicato,* 865 F.2d 1370, 1381–85 (2d Cir.) (en banc) (nearly simultaneous shooting and killing of three persons constituted more than one predicate act), *cert. denied,* —— U.S. ——, 110 S.Ct. 56, 107 L.Ed.2d 24 (1989). Second, as discussed above, the consolidated complaint does not merely allege securities fraud violations; there are also cognizable mail fraud violations. *Beauford, supra.* Accordingly, we conclude that the requirement of charging at least two predicate acts is satisfied.

We must now consider whether these predicates are sufficiently related and amount to, or pose a threat of, continuity such that they constitute a pattern of racketeering activity. *H.J. Inc.,* 109 S.Ct. at 2900. Adopting a provision from the Dangerous Special Offender Sentencing Act, 18 U.S.C. § 3575, *et seq.,* the Supreme Court defined "relatedness" as " 'criminal acts that have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events.' " *H.J. Inc.,* 109 S.Ct. at 2901 (quoting 18 U.S.C. § 3575(d)). Thus, the necessary relationship between predicate acts may be established in a number of ways, including "temporal proximity, or common goals, or similarity of methods, or repetitions." *United States v. Indelicato,* 865 F.2d 1370, 1382 (2d Cir.) (en banc), *cert. denied,* —— U.S. ——, 110 S.Ct. 56, 107 L.Ed.2d 24 (1989).

Clearly, the requirement of relatedness is satisfied. The alleged mail fraud, whereby defendants transmitted the offering memorandum to each of the plaintiffs, is unquestionably related to the alleged fraud in connection with the sale of securities to each plaintiff, with each act being temporally proximate to the others. Similarly, the purposes of the acts as well as the methods of commission were the same.

548

The question of continuity is much more difficult. The Supreme Court, in *H.J. Inc.*, recognized the difficulty of defining the concept of "continuity," and offered the following guidance:

"Continuity" is both a closed- and open-ended concept, referring either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition.... It is, in either case, centrally a temporal concept—and particularly so in the RICO context, where *what* must be continuous, RICO's predicate acts or offenses, and the *relationship* these predicates must bear one to another, are distinct requirements. A party alleging a RICO violation may demonstrate continuity over a closed period by proving a series of related predicates extending over a substantial period of time. Predicate acts extending over a few weeks or months and threatening no future criminal conduct do not satisfy this requirement: Congress was concerned in RICO with long-term criminal conduct. Often a RICO action will be brought before continuity can be established in this way. In such cases, liability depends on whether the *threat* of continuity is demonstrated....

*H.J. Inc.*, 109 S.Ct. at 2902 (citations omitted) (emphasis in original). Continuity may be inferred from all of the surrounding circumstances, including the acts themselves or the nature of the enterprise. *H.J. Inc.*, 109 S.Ct. at 2902; *see Beauford*, 865 F.2d at 1391–92 (inferring threat of continuity from the acts); *Indelicato*, 865 F.2d at 1384 (inferring threat of continuity from the enterprise).

Although the specific acts charged in the Consolidated Complaint relate to the sale of interests in one particular investment vehicle, the complaint also clearly alleges that the World, Western and Partnership (save the AWNLP itself which is bankrupt) defendants are involved in the business of selling similar interests to the public on a continuing basis and that these offerings are also alleged to be fraudulent. *See, e.g.*, ¶ 8G (allegations of fraudulent offerings prior to the AWNLP offering), ¶¶ 6I and 111, 150–51 (allegations relating to the attempted fraudulent resyndication of the AWNLP nursery business), and ¶¶ 115–16 (allegations for fraudulent offerings since the AWNLP offering). Thus, despite the fact that the particular predicate acts complained of spanned only a few months, we conclude that the plaintiffs have sufficiently alleged at least the threat of continuity by demonstrating that the predicates are a part of these defendants' regular way of doing business. *H.J. Inc.*, 109 S.Ct. at 2902; *Amsler v. Corwin Petroleum Corp.*, 715 F.Supp. 103, 103–04 (S.D.N.Y.1989); *see also Reinfeld v. Ricklis*, 722 F.Supp. 1077, 1083 (S.D.N.Y.1989) (threat of continuity found from allegations that relatively short-lived scheme was part of a larger pattern of misconduct). Accordingly, the Section 1962(c) claims cannot be dismissed against the World, Partnership and Western defendants.

■ Turning now to the determination of whether the RICO conspiracy is adequately alleged, we conclude that it is not. In order to properly plead such a conspiracy under Section 1962(d), plaintiffs must allege that the " 'defendant himself at least agreed to commit two or more predicate crimes.' " *United States v. Teitler*, 802 F.2d 606, 613 (2d Cir.1986) (quoting *United States v. Ruggiero*, 726 F.2d 913, 921 (2d Cir.), *cert. denied*, 469 U.S. 831, 105 S.Ct. 118, 83 L.Ed.2d 60 (1984)). The commission of the acts is not necessary; only the agreement is required. *Teitler*, 802 F.2d at 613. Furthermore, "the commission of the acts is distinct from an agreement to commit them, and a violation of § 1962(d) requires different proof than a violation of § 1962(c)." *United States v. Bonanno Organized Crime Family*, 683 F.Supp. 1411, 1441 (E.D.N.Y.1988), *appealed from on other grounds and aff'd*, 879 F.2d 20 (2d Cir.1989) (citations omitted). While plaintiffs allege that each of the defendants committed two or more of the predicate acts, ¶ 146, the complaint merely states that

[c]ommencing in or about November 1984, the defendants and each of them, conspired to and did participate in the

conduct of the above enterprise's affairs through a pattern of racketeering activity as alleged in hereinabove, in violation of 18 U.S.C. Sections 1962(c) and 1962(d). ¶ 151. The complaint does not adequately allege that each defendant *personally* agreed to commit two or more of the predicate acts. *Reinfeld v. Ricklis,* 722 F.Supp. at 1084 (emphasis added). It is not enough to agree that the crimes should be committed by others. *Zola v. Gordon,* 685 F.Supp. 354, 377 (S.D.N.Y.1988). Accordingly, the motions to dismiss the Section 1962(d) claims are granted.[13]

Finally, we address the defendants' argument that the Section 1962(a) claim must be dismissed. Section 1962(a) prohibits the use or investment of income received from a pattern of racketeering activity in the acquisition, establishment or operation of an enterprise. Thus, the violation under 1962(a) is not the engaging in a pattern of racketeering activity, but rather it consists in using or investing the proceeds derived from such a pattern of activity. The World and Partnership as well as the Friedman & Shaftan defendants argue that plaintiffs have not alleged, as they must, that their injury has somehow been caused by the investment of the racketeering proceeds. *See In re Gas Reclamation Inc. Securities litigation,* 659 F.Supp. 493, 511 (S.D.N.Y.1987); *DeMuro v. E.F. Hutton,* 643 F.Supp. 63, 66 (S.D.N.Y.1986). We agree. As the complaint does not adequately allege any damages other than the loss of their investments, and since it is clear that these injuries arise out of the commission of the predicate acts, and not from any investment by the defendants of the racketeering proceeds, *see DeMuro v. E.F. Hutton,* 662 F.Supp. 308 (S.D.N.Y. 1986), the Section 1962(a) claims are dismissed.

To summarize our disposition of the RICO claims, we dismiss the Section 1962(c) claims against the Bryce, Andersen and Friedman & Shaftan defendants, but sustain them against the World Partnership and Western defendants. We dismiss the Section 1962(a) and (d) claims.

## E. OTHER CLAIMS FOR RELIEF

Plaintiffs' third, fourth and fifth claims assert common law claims for damages for fraud, negligent misrepresentation and fiduciary duty respectively. Plaintiffs' ninth claim for relief seeks a declaration that all of the defendants hold the proceeds from plaintiffs' investments in constructive trust for the benefit of the plaintiffs. Assuming that all of the federal claims would be dismissed, all of the defendants moved to dismiss these claims[14] for lack of subject matter jurisdiction pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure. Almost all the briefs cite the language of the Supreme Court in *United Mine Workers v. Gibbs,* 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966) that "[c]ertainly, if the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well." *Id.* at 726, 86 S.Ct. at 1139 (citations omitted).

None of the defendants briefed the result that we have reached today: dismissing the federal claims against only some of

---

**13.** We note that even if an agreement had been properly alleged, the Bryce, Andersen and Friedman & Shaftan defendants could not be held to be RICO conspirators. Mere allegations of agreement are not enough to support a charge of RICO conspiracy. *Morin v. Trupin,* 711 F.Supp. 97, 111 (S.D.N.Y.1989). Plaintiffs must also show that the " 'defendants understood the scope of the enterprise and knowingly agreed to further its affairs through the commission of various offenses.' " *Id.* (citation omitted). No facts are set forth supporting the contention that these defendants "knowingly agreed" to commit the predicates, *see supra* at 531–35 (finding that the plaintiffs were unable to demonstrate that

these defendants had the requisite fraudulent intent). Accordingly, even if we had found that the RICO conspiracy was properly alleged, the Section 1962(d) claims against these defendants would have to be dismissed nonetheless. *Department of Economic Development v. Arthur Andersen & Co.,* 683 F.Supp. 1463, 1482 (S.D.N.Y.1988); *Andreo v. Friedlander, Gaines, Cohen, Rosenthal & Rosenberg,* 660 F.Supp. 1362, 1372 (D.Conn.1987); *Laterza v. American Broadcasting Co.,* 581 F.Supp. 408, 413 (S.D.N.Y.1984).

**14.** The Western defendants also moved to dismiss the seventh and eighth claims, which seek declaratory and injunctive relief only against the Western defendants, on the same grounds.

the defendants. Nonetheless, regarding those defendants against whom we have sustained federal claims, it is clear that we have pendent-claim jurisdiction over the nonfederal claims against each which "derive from a common nucleus of operative fact." *Gibbs*, 383 U.S. at 725, 86 S.Ct. at 1138. The difficulty arises regarding those defendants (the Andersen, Friedman & Shaftan, and Bryce defendants) who were successful on their motions to dismiss. Plaintiffs have not and cannot base subject matter jurisdiction on diversity of citizenship, for it is indisputable that the requirement of complete diversity cannot be established. *Owen Equipment & Erection Co. v. Kroger*, 437 U.S. 365, 373–74, 98 S.Ct. 2396, 2402, 57 L.Ed.2d 274 (1978) (diversity jurisdiction requires that each defendant be a citizen of a different state than each of the plaintiffs). Accordingly, as to these defendants, we must examine the doctrine of pendent-party jurisdiction: "jurisdiction over parties not named in any claim that is independently cognizable by the federal court." *Finley v. United States*, —— U.S. ——, 109 S.Ct. 2003, 2006, 104 L.Ed.2d 593 (1989).

"The doctrine of pendent-party jurisdiction provides a much narrower basis for jurisdiction than the doctrine of pendent-claim jurisdiction...." *640 Broadway Renaissance Co. v. Cuomo*, 714 F.Supp. 686, 689 (S.D.N.Y.1989). Indeed, although the Supreme Court, in its recent pronouncement on the subject, did not explicitly reject the doctrine, as set forth in its prior opinion in *Aldinger v. Howard*, 427 U.S. 1, 96 S.Ct. 2413, 49 L.Ed.2d 276 (1976), it certainly cast negative aspersions on it, holding that pendent-party jurisdiction is not permissible in cases arising under the Federal Tort Claims Act, 28 U.S.C. § 1346(b). *Finley v. United States*, 109 S.Ct. at 2009–10; *see also Bruce v. Martin*, 724 F.Supp. 124, 128–30 (S.D.N.Y.1989) (discussing the "negative implications" of *Finley* on the doctrine). Indeed, our Circuit Court recently stated, in dicta, that "pendent-party jurisdiction is apparently no longer a viable concept," citing *Finley*. *Staffer v. Bouchard Transportation Co.*, 878 F.2d 638, 643 n. 5 (1989).

Because of the complexity of this area of the law, and in light of all of the nuances relating to each of the common law claims alleged and the fact that the parties did not brief the issue, we will allow the parties to supplement their papers on this question. Specifically, we would like the parties to address the question according to the insightful three-tier analysis of Judge Walker in *640 Broadway Renaissance Co. v. Cuomo*, 714 F.Supp. at 690, looking first, at whether we have Article III power to exercise jurisdiction over the claims; second, at whether Congress, in the statutes conferring jurisdiction, has not expressly or by implication negated the existence of jurisdiction; and third, at whether, there are discretionary considerations which indicate that jurisdiction should or should not be exercised. The submissions of the defendants should be filed within 30 days of the date of this Order, with the plaintiffs' submission being due 30 days thereafter.

With regard to the Western defendants' motion to dismiss plaintiffs' seventh and eighth claims for relief, wherein declaratory and injunctive relief is sought against the Western defendants, we deny the motion without prejudice to renew, as we are not apprised of the status of the prior actions that were commenced in Arizona and, thus, are unable to adjudicate the motion at this time. Furthermore, we observe that the issues appear not to have been fully briefed, again we surmise in anticipation of complete success on their federal claims. If the Western defendants so desire, the motion shall be renewed in accordance with the schedule set out in the above paragraph.

### III. CONCLUSION

The motions of the Andersen, Friedman & Shaftan, and Bryce defendants to dismiss the federal securities fraud claims, pursuant to Section 10(b) of the 1934 Act, Section 12(2) and Section 17 of the 1933 Act, and the RICO claims are granted in their entirety. The motions of the World, Partnership and Western defendants to dismiss the claims pursuant to Section 12(2) and 18 U.S.C. § 1962(c) are denied, but the

motions to dismiss the Section 17(a) claims and the RICO claims pursuant to 18 U.S.C. § 1962(a) and (d) are granted, and the motions to dismiss the Section 10(b) claims are granted in part and denied in part, as explained *supra* at 35–40. In light of the fact that the present incarnation of the complaint represents plaintiffs' fourth attempt to adequately state federal causes of action, we believe that it would be inappropriate to allow plaintiffs to replead yet another time. *See Armstrong v. McAlpin*, 699 F.2d 79, 93–94 (2d Cir.1983) (district court's refusal to give plaintiffs a fourth attempt to restate defective allegations was proper); *Decker v. Massey–Ferguson, Ltd.*, 681 F.2d 111, 115 (2d Cir.1982) (district court's refusal to give plaintiffs a third attempt to restate defective allegations was proper); *Denny v. Barber*, 576 F.2d 465, 470–71 (2d Cir.1978) (same). Accordingly, all of the above dismissals are with prejudice.

The Andersen, Friedman & Shaftan, and Bryce defendants have thirty days to renew their motions to dismiss the remaining claims for lack of subject matter jurisdiction or on discretionary grounds, and the Western defendants have thirty days to renew their motion to dismiss the equitable claims for relief.

SO ORDERED.